IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WILLIAM H. CARLSON,

               Plaintiff,

     vs.

ANDREW M. SAUL, Commissioner of
Social Security.

               Defendant.

**8:19CV561**

**MEMORANDUM AND ORDER**

This matter is before the Court on motions for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner").  Filing Nos. 12 and 14.  The plaintiff, William H. Carlson, appeals the Commissioner's decision to deny his application for Social Security Disability benefits under the Social Security Act and seeks review pursuant to 42 U.S.C. § 405(g).

I.     **BACKGROUND**

     A.    **Procedural History**

Carlson filed an application for disability benefits on July 7, 2016, alleging that he suffered from a disability beginning on February 6, 2014.  Filing No. 7-2, Transcript ("Tr.") at 10.  Plaintiff must establish disability on or before the date he was last insured, December 31, 2018, in order to be entitled to benefits.  42 U.S.C. § 416(i); 42 U.S.C. § 423(d).  The Commissioner denied his application initially and upon reconsideration.  Following a February 25, 2019 hearing, and administrative law judge ("ALJ") denied benefits on April 1, 2019.  Filing No. 7-2, Tr. at 7.  On October 24, 2019, the Appeals Council denied review, and the ALJ's decision stands as the final decision of the Commissioner.  *Id.* at 1-4.

Carlson challenges the ALJ's finding, arguing that there was no substantial evidence to determine Carlson was not disabled during both step four and step five of the sequential analysis, the ALJ did not properly credit Carlson's treating physician and pain management specialist, and the ALJ erred in finding Carlson's subjective pain determinations not credible.  Filing No. 12, Tr. at 19, 21, 24, and 27.

### B.   Hearing Testimony

Plaintiff is now 60 years old and was 54 at the time of his alleged onset date.  On February 6, 2014, Carlson fell onto the handlebar of a scooter in his garage.  Filing No.7-8, Tr. at 282.  The scooter "jammed into [Carlson's] tailbone."  *Id.*  Carlson developed a hematoma and, subsequently, severe back pain that never subsided.  He has past relevant work experience as the office manager of a plumbing business and has a high school diploma.  Filing No. 13, Tr. at 2-3.  Carlson, with the help of his niece, filed for disability in 2016.  Filing No. 7-7, Tr. at 231.  In his disability application, his niece Dawn Mastra explained Carlson's limitations, levels of pain, and daily activities.  While she sometimes gave her own opinion, she assured that she was transcribing Carlson's words. *Id.* at 231-243.

At the hearing held in front of the ALJ on February 25, 2019, Carlson testified that he lives with his mother in the house she owns.  Filing No. 7-2, Tr. at 33.  Carlson testified that he was last employed in 2013.  He worked as the office manager of a plumbing company and was terminated when the business transitioned ownership.  When asked to describe his duties as the office manager, Carlson stated, "[p]retty well did all the financials, scheduling, servicing, excuse me, not servicing, but setting up servicing. APAR, payroll.  I also dealt with all the vendors for purchasing.  Occasionally, went to job

sites, learned some of the trade, which was a good thing." *Id.* at 35.  While he occasionally went to job sites, it was not frequent.  After Carlson was laid off in 2013, he sought other employment but did not have any success with job applications.  *Id.* at 34-35.

The ALJ then questioned Carlson about the spinal cord stimulator that was recently implanted.  Carlson testified that while the trial spinal cord stimulator was working well for him, the permanent stimulator was not as effective, and he was still in large amounts of pain.  *Id.* at 36.  He stated that the permanent stimulator, according to his doctors, was not programmed at the same level of the trial stimulator.  Carlson had appointments scheduled to take x-rays of his back to see if the stimulator needed to be reprogrammed or if the stimulator had repositioned itself on his spine.  If it had repositioned, his doctors would likely need to "cut [him] again." *Id.* at 36-38.

The ALJ then asked, "All right, well, how does your back condition now impair your abilities to go throughout the day?" *Id.* at 38.  Carlson stated that he is in a high level of constant pain and is limited in his ability to move.  He explained, "[E]ven driving up here today, sir, I had to stop to get out of the car because it just hurts.  It hurts all the time.  The medications . . . [are] not as effective as it used to be.  I have a hard time sleeping . . . I can't get comfortable." *Id.*  When asked what he is able to do, even with his back pain, Carlson stated that while he can take care of his own hygiene, dress himself, and cook for himself, he does not leave the house very often and does not visit his friends or family as much as he used to.  His sister mostly does the grocery shopping and drives both Carlson and his mother to their doctor appointments.  *Id.* at 40-41.  He said he mostly spends his time staying home and reading books.  *Id.* at 39.

Carlson then explained that he was involved in a car accident a little over a year before the date of the hearing that further limited his abilities to move and function. *Id.* His surgeon, Matthew J. Stottle, M.D., placed him on a five-pound lifting restriction. *Id.* at 40. Carlson testified, "all the stuff I used to do around the house and the yard and things like that, I can't do anymore." *Id.* He also said that he spends most of his days lying flat supported by "[a] lot of pillows." *Id.* at 41.

The ALJ questioned Carlson about his alcoholism. Carlson testified that he was a recovering alcoholic, and while he is not completely sober, he has only "had a couple of drinks this calendar year" and it had "been over two weeks since [he] had [his] last drink" as it does not react well with his prescription medications. *Id.* at 34. The ALJ then asked if Carlson had completed counseling or gone through his primary care physician for treatment, but the ALJ moved on before Carlson was able to answer. *Id.*

Mr. Cuddigan, Carlson's attorney, then examined him. When asked by Mr. Cuddigan if Carlson had "learned the hard way" of lifting more than five pounds or doing chores around the house, Carlson replied yes. *Id.* at 41-42. Mr. Cuddigan also asked Carlson about the treatment he underwent for alcoholism. Carlson testified that he had "intensive appointments" with his treating physician, Brock LaSure, M.D., over the course of several months. Dr. LaSure monitored him for both alcoholism and his back pain over the course of those months. While Carlson did have a few relapses, he has now limited his drinking and "pretty much [tries] not to drink." *Id.* at 42. He testified, "There is no liquor in the house at any time." *Id.* at 43.

When asked how long he can sit or stand at one time, he stated:

> It varies. Again, if I'm fatigued, or if I'm hurting, I can't stand very long after that. The drive up here, just now. I stopped twice on my way up here. And

4

> since I've been sitting out there waiting to come in, I've had to get up like
> every two or three minutes because the drive up here was pretty tough. It
> took me an hour and a half to get here, which should be like a 25-minute
> drive. So it varies depending on how good I feel or how bad I feel.

*Id.* Carlson said he can stand for three to five minutes and sit ten to twenty minutes before

needing to shift positions. His alleged disabling pain is mainly located in the "[b]eltline,

lower spine, down the right buttocks into the feet." *Id.* at 43-44.

Mr. Cuddigan then questioned Carlson about the physicians he had seen since his

alleged onset date. He testified that his treating physician, Dr. LaSure, referred him to

Dick Slater, M.D., in 2014 for his first caudal block procedure. He then saw Thomas A.

Brooks, M.D., for approximately three to five nerve blocks and steroid injections. He then

began seeing Michael Lankhorst, M.D., at the University of Nebraska Medical-Center. Dr.

Lankhorst performed a radiofrequency ablation. Finally, Dr. Stottle performed the trial

and permanent spinal cord stimulation implant procedures in 2018 and early 2019. *Id.* at

44-46.

Carlson then described the numerous medications he had tried since his alleged

onset date. Fentanyl caused side effects such as drowsiness, nervousness, and

abdominal pains. While on these two medications, Carlson fell numerous times. When

describing the medications, Carlson said, "Fentanyl . . . it's a wicked drug. It's a bad drug

. . . . Stottle says, I don't give it to anybody unless they're dying, and let's get you off of it.

And I said, please, right away." *Id.* at 46. Even while taking medication that does not

cause side effects, Carlson's pain "always hovers around the five or six. A lot of times

seven or eight . . . ." *Id.* at 46-47.

Mr. Cuddigan asked if the medications affect his concentration, and Carlson

replied yes. He stated that, while he still drives, he has stopped driving on the interstate

5

and only takes services streets for fear of getting in an accident.  The day of the hearing, since Carlson knew he would be driving, he took his medication at 3:30 AM "to make sure my medicine was pretty much in me and on the downhill slide" so he was not driving under the influence.  *Id.* at 47.  When asked if his lack of concentration would limit his ability to perform the duties of his previous job, Carlson testified that it would. He stated, "You know, numbers, memory, recollection, inventory controls, things like that.  Payroll.  You mess up payroll, especially on a union payroll, you're going to get in a lot of trouble.  I just – I don't have that concentration or ability.  Sorry."  *Id.* at 47-48.

Carlson then testified that he had not applied for a job since 2014.  When asked why, he stated that his back continues to get worse.  Mr. Cuddigan asked, "And during the course of this hearing, have you been up and down a number of times?"  Carlson said he was "[b]ecause the pain is bad, and I can't get comfortable."  *Id.* at 48.  He then testified that he mostly lays down with pillows and it is difficult for him to get a good night's sleep due to the pain.  He also needs to lay down for four to five times a day for approximately 45 minutes to an hour each time.  *Id.* at 49-50.

The ALJ then questioned the vocational expert, Robert Brezinski.  First, the ALJ asked Mr. Brezinski to describe Carlson's work experience by job title, exertional level, and skill level.  Mr. Brezinski categorized Carlson's past employment as "manager of a retail store" citing to the DOT.  He stated it is light work, but Carlson performed it at a heavy exertional level.  *Id.* at 52.  The ALJ gave the vocational expert a hypothetical.  He asked the expert to assume that an individual the same age as Carlson with the same education and job experience is capable of performing light work but has no ability to climb ropes, ladders, scaffolds, or crawl.  The individual could occasionally climb ramps,

stairs, could balance, and could tolerate extreme temperatures.  He asked, "Could that hypothetical individual perform the past job that you've identified and described earlier as actually performed or generally performed in the national economy?"  *Id.* at 52.   The expert responded, "Given these limitations, I believe that the past job would be able to be performed according to the definition of the DOT; but according to the employee's description of as it was performed, it would not be appropriate."  *Id.* at 52-53.  Mr. Brezinski testified that Carlson did possess transferrable skills such as "finance-related skills" and "office-type work skills" that would not require any additional training or education.  *Id.* at 53.  Mr. Brezinski stated that there were positions of employment in the national economy that would allow for the ALJ's hypothetical impairments and would require Carlson's transferrable skills.   These include an order clerk, customer complaint clerk, customer service, and payroll clerk.  *Id.*

The ALJ then asked if the same individual would be able to perform Carlson's previous work experience if the individual could only sit for 30 minutes before needing to stand for a five-minute period.  Mr. Brezinski stated that, if the position was performed at the light exertional level as described in the DOT, the individual would be able to complete the duties required.  However, Mr. Brezinski noted that Carlson performed the position at the heavy exertional level.  For that reason, Mr. Brezinski stated the individual would not be able to perform the work as previously performed by Carlson.  *Id.* at 54-55.

When asked if the same hypothetical individual could perform the jobs identified such as order clerk, customer complaint clerk, and payroll clerk, Mr. Brezinski stated, "Yes, I believe so, but I would reduce the numbers by 50%.  And again, it would have to be at a situation where the desk would be able to be lowered or raised . . . [t]he numbers,

however . . .  are reduced by 50%." *Id.* at 55-56.  The ALJ then asked if those jobs would be available to someone who would miss two or more days of work per month.  Mr. Brezinski replied, "In my opinion, no . . . that would not be compatible with employers' expectations for competitive employment." *Id.* at 56.

Mr. Cuddigan then cross-examined Mr. Brezinski. He asked why Mr. Brezinski would categorize Carlson's work as the manager of a plumbing business as "manager of a retail store."  *Id.* at 56.  Mr. Brezinski testified, "I looked in several places to see if there would be a manager of a plumbing company or . . . a service company.  And I didn't, I didn't find anything that, that would mark or accurately describe what would be done.  So that's why I used that, that particular DOT definition." *Id.* at 58.

When asked what skills Carlson possessed that would be transferable to other positions, Mr. Brezinski stated, "The work processes are dealing with, dealing with employees, dealing with the, the general public, dealing with ordering materials, working with finances, those types of things."  *Id.*  Mr. Cuddigan then asked what the MPSMS code would be.  Mr. Brezinski stated that he did not know what that meant, and he had never been asked that question before. *Id.* at 58-59.

> Q: Are you familiar with Social Security's Rules and Regulations that describe the procedure for determining transferable skills?
>
> A:  I, I'm not sure if I've seen that.  And my understanding would be I look at the SVP of the jobs, and that would determine the capability to – of someone performing various types of work.

*Id.* at 59.  After Mr. Cuddigan ended his examination, the ALJ asked if Mr. Cuddigan had a job title in mind that would be more appropriate for the work Carlson performed.  Mr. Cuddigan respectfully stated that it was the government's burden to prove step five, not

the claimant's burden.  *Id.* at 59-60.  After a discussion off the record, Mr. Cuddigan stated:

> Your Honor, I don't believe that the Vocational Expert described the past work of the Claimant accurately.  And – nor do I believe that he had an adequate explanation for the transferrable skills analysis under the CFR and under the regulations.  And I don't believe that he was competent to render the opinions that he rendered.  And I didn't object to his qualifications at the beginning of the hearing, because generally it's a waste of time.  I, I say that now, with an edge in my voice and not disrespectfully.  But rather just to indicate to you that I don't think that this witness was qualified to testify in this case.

*Id.* at 60-61.  The hearing then concluded.

## C.    Medical Evidence

On February 6, 2014, Carlson presented himself to the Bellevue Medical Center due to pain in his lower back.  Medical notes written by Leah R. Rowell, P.A., indicate that Carlson fell in his garage two days prior and fell onto the handlebars of a scooter.  The scooter "jammed into [Carlson's] tailbone."  Filing No. 7-8, Tr. at 282.  Carlson could feel a "bubble" in his lower back and the pain continued to increase.  *Id.*  This bubble was diagnosed as a hematoma.  Medical notes state, "Upon CT results and discussion w/ Dr. Woods and Dr. Smith in radiology, we elected for conservative therapy (pain management) rather than attempting to drain the hematoma."  *Id.* at 284.  Carlson was prescribed Valium for his anxiety and Percocet for his back pain.  *Id.* at 286.

Carlson saw his treating physician, Dr. LaSure, on February 20, 2014.  Dr. LaSure noted that while the bruising on the hematoma had improved, it was more swollen and more firm to the touch.  *Id.* at 297.  Dr. LaSure noted, "hand sized area of swelling just [left] of midline upper buttock some tenderness, no redness, minimal bruising."  *Id.* at 298.

Carlson managed his pain with ice, resting, and pain medication.  Dr. LaSure refilled Carlson's Percocet prescription and advised him to try warm compresses on his back.  *Id.*

On March 28, 2014, Carlson arrived at the Bellevue Medical Center emergency room.  He told Walter S. Wood, M.D. that his back pain had been worsening over the past three days.  *Id.* at 288.  Dr. Wood noted that Carlson had alcohol on his breath and a possible abscess in his mouth.  He also stated that, "[Carlson] exhibits decreased range of motion, tenderness and swelling.  He exhibits no bony tenderness." *Id.* at 290.

Carlson visited Dr. LaSure again on July 11, 2014.  Dr. LaSure noted that Carlson's pain had started to get worse and had "[p]ain with ambulation and bending." *Id.* at 301.  Carlson explained that it was hard for him to get comfortable and the pain was radiating down his buttocks and into his legs.  His anxiety was getting worse and was suffering from occasional panic attacks.  He also stopped drinking.  Dr. LaSure prescribed Clonazepam for his anxiety and the narcotic medication Norco for his pain.  *Id.* at 303-04.

An MRI was performed on July 18, 2014, which found that the "[h]ematoma about the level of the sacrum on the prior CT completely resolved on the current exam." Filing 7-9, Tr. at 351.  However, the MRI revealed the following:

> L1-2: Shallow disk bulge without central canal or neuroforamina stenosis.
>
> L2-3: Combination of shallow disk bulge and moderate hypertrophic changes of the facet joints and ligamentum flavum resulting mild bilateral lateral recess stenosis.  Neural foramina patent.  Mild central canal stenosis resulting from superimposed slightly prominent posterior epidural fat pad.
>
> L3-4: Combination of circumferential disk bulge and moderate hypertrophic changes of the facet joints and ligamentum flavum result in moderate to severe bilateral lateral recess stenosis and mild bilateral neural foramina stenosis.  Superimposed slightly prominent posterior epidural fat that results in mild central canal stenosis.  Tiny central disk protrusion measuring up to 5 x 1 mm.

L4-5: Combination of circumferential disk bulge and moderate hypertrophic changes of the facet joints and ligamentum flavum result in moderate to severe bilateral lateral recess stenosis. Mild right and mild to moderate left neuroforamina stenosis. Central canal is patent.

L5-S1: Tiny central disk protrusion. Mild hypertrophic changes of the facet joints. Central canal and neural foramina are widely patent.

*Id.*

Carlson followed up with Dr. LaSure on July 24, 2014. Dr. LaSure noted that the Percocet was helping his pain, but the pain was still persistent once the medication wore off. Dr. LaSure offered Carlson physical therapy, but Carlson declined due to his poor health insurance coverage. Instead, he prescribed a steroid burst and recommended Carlson continue taking Percocet. If the pain persisted, they would try a caudal block. Dr. LaSure prescribed Prednisone and scheduled Carlson for a follow up appointment in two weeks' time. Filing No. 8-1, Tr. at 463-64.

At the two week follow up appointment with Dr. LaSure, Carlson stated that the steroid burst did not alleviate his pain. However, he had no pain down his legs and the Percocet was still helping. Dr. LaSure refilled Carlson's Percocet prescription and gave him a caudal block referral. *Id.* at 466-67. The caudal block was later performed by Dr. Slater on August 22, 2014. Filing No. 7-9, Tr. at 339-40. At his follow up appointment on September 2, 2014, Carlson told Lacia R. Chapman, M.D., that the caudal block did not alleviate his pain. Even with Percocet he continued to have persistent back pain. Dr. Chapman referred him to a spine specialist and refilled his Percocet prescription. Filing No. 7-8, Tr. at 310-11.

Carlson first saw spine specialist Chris A. Cornett, M.D., on September 19, 2014. Dr. Cornett reviewed Carlson's MRI and opined that it was "essentially unremarkable."

11

Filing No. 7-9, Tr. at 353.  While there was "some slight swelling over his lower spine," and had very mild stenosis and arthritis, there was almost no nerve compression.  *Id.*  He recommended physical therapy and ordered a one-time prescription of Valium.  He told Carlson that he expected "him to improve slowly over time."  *Id.*

Carlson saw Dr. LaSure on January 15, 2015 and told him that the swelling and pain was much better.  Filing No. 8-1, Tr. at 475.  However, on June 30, 2015, Carlson told Dr. LaSure that his lower back pain had increased in the last four days after he cleaned out the gutters.  While he did not fall, the activity caused the pain to increase the next day.  Filing No. 7-8, Tr. at 312.  Dr. LaSure prescribed Percocet for the pain.

Carlson returned to Dr. LaSure's office on August 6, 2015 for worsening pain.  Dr. LaSure noted "[s]ome [alcohol] use he says but just few drinks every few days."  Filing No. 7-8, Tr. at 314.  Dr. LaSure also opined that Carlson had "pain over distal L spine /paraspinus muscles."  *Id.*  Dr. LaSure prescribed Percocet and once again referred Carlson to Dr. Cornett "for one more opinion on [a] more permanent fix."  *Id.* at 315.  After a visit with Dr. Cornett on August 24, 2015, the doctor reported that Carlson was doing well over the summer, but his back pain worsened after doing activities such as lifting ladders, bending, and doing other household chores.  Filing No. 7-10, Tr. at 393.  Dr. Cornett noted, "We discussed getting back into his home exercise program.  He has an acute flare-up of his chronic back pain.  I am going to give him Flexeril to use for a few weeks.  Otherwise, we would have him wear his corset when he is doing heavy activity and then he will follow up as needed."  *Id.*

Over the continuing months, Carlson's pain subsided.  However, on December 2, 2015, Carlson presented himself to Dr. LaSure due to worsening back pain.  He told Dr.

LaSure that while pain medications do help, they are less effective over time.  Dr. LaSure noted that the previous injections were not effective and recommended that Carlson obtain another MRI.  Dr. LaSure once again prescribed Percocet and told Carlson to call him once he found an office within his price range that could complete the MRI.  Filing No. 7-8, Tr. at 323-24.

The MRI was completed on December 4, 2015.  The results noted, "Mild anterior wedge type compression deformity of L1 on a developmental basis.  Remainder of the lumbar vertebral bodies maintain normal height.  Mild dehydration of discs throughout the lumbar spine."  Id. at 294.  The only major change from the previous exam was found on L3-4.  The results state, "Mild spinal stenosis secondary to facet hypertrophy, mild diffuse disc bulge, and epidural lipomatosis.  Mild right neural foraminal stenosis secondary to facet hypertrophy and disc material extending asymmetrically into this neural foramen.  Left neural foramen is widely patent.  No lateral recess stenosis."  Id.

On March 14, 2016, Carlson came to Dr. LaSure due to increasing back pain.  Carlson stated that he now needed two Percocet to manage his pain, while before he only needed one and a half.  His depression and anxiety were normal and well-controlled as well as his alcoholism.  Id. at 325-26.  Similar notes were recorded during a June 6, 2016 appointment.  Carlson indicated that he did not go out much due to his back pain and mostly read books to fill his time.  Filing No. 8-1, Tr. at 511.  Again, similar notes were recorded during a July 22, 2016 visit.  However, Carlson stated that his depression was worse and indicated that he was applying for disability.  Dr. LaSure discussed starting Carlson on a new anti-depressant and told Carlson to cut back on smoking.  Filing No. 7-8, Tr. at 332-34.

Carlson saw pain management specialist, Thomas A. Brooks, M.D., on August 1, 2016. Carlson rated his pain a 6 on a scale of 1-10 and said that bending, walking, and sitting all increase his back pain. Filing No. 7-9, Tr. at 358. Upon examination, Dr. Brooks noted that "he has multifactorial pain." *Id.* at 362. "On examination he has evidence of both sacroiliac and facet joint pain. His sacroiliac joint pain appears to be the most painful at this time." *Id.* Dr. Brooks discussed the possibility of bilateral sacroiliac joint injections and recommended physical therapy and the cessation of opiates for his pain as they have "very little long-term benefit." *Id.* As well as sacroiliac injections, Dr. Brooks noted that Carlson would also likely need facet injections sometime in the future as well.

On August 10, 2016, Dr. Brooks performed a bilateral sacroiliac joint injection under fluoroscopy. *Id.* at 364. During an appointment with Dr. LaSure on August 18, 2016, Carlson noted that the injections did not improve his pain. He also felt weaker and depressed. Dr. LaSure refilled his pain medication and recommended that Carlson follow up with Dr. Brooks and start considering possible facet injections. Filing No. 8-1, Tr. at 528-29. At the follow-up appointment at Dr. Brooks' office on August 29, 2016, Carlson stated that he had 100% relief of his pain following the injections, but only for a few hours. Afterward, the pain returned. The notes state that his "left SI joint continues to be well controlled, however his right SI joint is causing him pain. He also continues to have facet arthropathy at L34, L45 and L5S1 bilaterally." Filing No. 8-3, Tr. at 575. Carlson also reported symptoms unrelated to his lumbar pain, and Dr. Brooks recommended that Carlson visit the emergency room. These symptoms eventually cleared up and are no longer an issue for Carlson.

During the next appointment with Dr. Brooks, he noted, "I see a general trend to improvement, but he continues to have pain that interferes with activities of daily living." *Id.* at 593. Dr. Brooks recommended facet joint injections to attempt to alleviate his pain. *Id.* at 589. The facet injections were performed on November 3, 2016. However, the pain relief only lasted two days, and two weeks later Carlson rated the pain at a four or six out of ten. *Id.* at 591. At an appointment with Dr. LaSure on December 30, 2016, he recommended Carlson switch to longer acting narcotic or otherwise modify his pain medication if his back pain did not continue to improve. Filing No. 8-4, Tr. at 626.

At a follow-up appointment with Dr. Brooks on January 30, 2017, Dr. Brooks noted, "Patient states the pain is in his lower back. States when he lays down and both of his big toes go numb and cold. Symptoms have been gradually worsening. Severity is rated as a 5 on a scale of 0-10. Pain interferes with activities of daily living." *Id.* at 642. After examination, Dr. Brooks stated that "[h]e continues to have evidence of lumbar facet joint pain on exam." *Id.* at 644. Dr. Brooks later performed a repeat facet joint injection to attempt to alleviate Carlson's lumbar pain. *Id.* at 645.

During an appointment with Dr. LaSure on February 28, 2017, the doctor noted that Carlson did not receive any noticeable benefit from the second facet injections. Carlson stated he used two to four Percocet per day as needed. Filing No. 8-5, Tr. at 683. Dr. LaSure prescribed Oxycodone, Lidocaine patches, and Fentanyl patches. Dr. LaSure commented that he did not recommend the use of Fentanyl for long term use but hoped it would alleviate his pain while transitioning to a new pain medication regimen. *Id.* at 685-86.

15

On March 6, 2017, Carlson attended a follow-up appointment with Dr. Brooks. Carlson stated that the injections two weeks prior did not alleviate his pain, and his pain rested between a 5-7 on a 1-10 scale. Filing No. 8-4, Tr. at 646. Dr. Brooks ordered a new MRI of the lumbar spine and recommended that he be reevaluated by Dr. Cornett. Id. at 648. The MRI was performed two days later and found no changes in his spine as compared to the previous MRI. Id. at 649. Dr. LaSure noted on March 20, 2017 that the MRI showed "no significant [change] or [worsening]" from the previous MRI. Filing No. 8-5, Tr. at 679.

During an appointment with Dr. LaSure on June 26, 2017, Dr. LaSure noted, "pain over distal L spine paraspinous muscles with light touch," after an examination. Id. at 722. He noted that Carlson was taking two to five Oxycodone per day and was still only feeling mild pain relief. Dr. LaSure started Carlson on a trial of Lyrica. Id. Carlson was only able to tolerate small doses of Lyrica due to the sedation he experienced with larger doses. Filing No. 8-7, Tr. at 812.

On August 17, 2017, Carlson saw pain specialist Michael Lankhorst, M.D. Carlson told Dr. Lankhorst that his pain was a ten out of ten and his symptoms had been gradually worsening over the past three years. Filing No. 8-6, Tr. at 727. As Carlson's "MRI results did not show any significant pathology besides facet arthropathy at multiple levels," Dr. Lankhorst determined that Carlson may benefit from a medial branch block procedure. Id. at 731. He also noted, "If he fails medial branch block, I think the next most reasonable option would be to consider the chronic pain program." Id. The medial branch block was performed on September 8, 2017. Id. at 732. Following the procedure, Carlson's pain maintained a 1 or 2 on a scale from 1-10. However, this only lasted one hour. Two weeks

16

following the procedure the severity of his pain reached a 10 out of 10.  *Id.* at 734.  During this exam, Dr. Lankhorst noted that Carlson was in "no apparent distress."  *Id.* at 736.  Dr. Lankhorst and Carlson agreed to do a second medial branch block procedure in the following weeks.  *Id.* at 737.

The second medial branch block was performed on October 13, 2017.  Filing No. 8-6, Tr. at 737-39.  However, just like the first medial branch block, the second procedure proved to be ineffective.  *Id.* at 740.  Dr. Lankhorst recommended that Carlson undergo a radiofrequency ablation procedure ("RFA").  *Id.* at 743.

On November 9, 2017, just one day before Carlson's scheduled RFA, Carlson was injured in a motor vehicle accident.  *Id.* at 744.  Sean R. Brozek, M.D., after describing the accident, noted, "He has a PMH of chronic low back pain . . . . [and] states his pain is located in the mid-lumbar region over the midline, is dull and throbbing, non-radiating, aggravated by movement and alleviated with rest.  He states it is similar in nature and description of his chronic pain just higher in intensity."  *Id.*  Dr. Brozek later stated that the accident most likely "exacerbated his chronic low back pain."  *Id.* at 747.  That same day, Carlson received a CT scan.  The findings stated that there were no fractures but, "Moderate loss of intervertebral disc space height at C5-6 posterior disc bulging producing mild spinal stenosis. Posterior disc bulging at C6-7 produces mild spinal stenosis. Uncovertebral hypertrophy produces severe right and moderate left C5-6 foraminal stenosis.  Advanced left C7-T1 facet joint osteoarthritis.  The paraspinal soft tissues are unremarkable."  *Id.* at 777.  The RFA was still performed by Dr. Lankhorst the following day as scheduled.  *Id.* at 779.

Dr. LaSure noted on a November 13, 2017 examination that Carlson reported the pain had worsened since the accident and had also begun experiencing knee pain. Filing No. 8-7, Tr. at 804. Dr. LaSure noted that Carlson underwent the RFA procedure and received "some moderate improvement in pain" but the pain had "flared up" due to the accident. *Id.* Dr. LaSure prescribed Oxycodone and recommended Carlson rest and use ice to alleviate the pain in his back and knee. *Id.* at 805. Carlson came in to see Dr. LaSure the next day due to swelling in his knee. *Id.* at 802. Dr. LaSure ordered an x-ray and reviewed herbals and supplements with Carlson. On November 20, 2017, the swelling in Carlson's knee had decreased but was still feeling pain down to his shin. On December 4, 2017, the swelling and pain in Carlson's knee had decreased dramatically and his back pain seemed to be better since the RFA procedure. *Id.* at 798-99.

Like the sacroiliac and facet injections, the RFA procedure alleviated Carlson's pain for a short period of time before wearing off. Filing No. 8-6, Tr. at 755. Dr. Lankhorst recommended that Carlson consider the pain management program as no procedure had been able to permanently alleviate his pain. *Id.* at 757.

Carlson returned to see Dr. LaSure on December 20, 2017 due to back and knee pain. While the swelling in his knee had gone down, "[s]ome popping, giving out, feeling of instability" and pain persisted. Filing No. 8-7 at 795. Carlson also stated that his back pain had gotten worse due to the motor vehicle accident. Dr. LaSure ordered a repeat MRI, and prescribed Oxycodone and Fentanyl. *Id.* at 796. Compared to the previous MRI, L4-5 exhibited, "Mild to moderate bilateral facet hypertrophy. Mild diffuse disc bulge. Moderate bilateral neural foraminal stenosis secondary to facet hypertrophy and disc material extending into each neural foramen, left side greater than right. No spinal or

18

lateral recess stenosis.  Mild progression of neural foraminal stenosis compared to previous exam."  Filing No. 8-6, Tr. at 780.

On April 5, 2018, Carlson told Dr. LaSure that his knee pain had drastically improved over the past month.  However, his back pain remained about the same.  Filing No. 8-7, Tr. at 785.  Dr. LaSure then referred Carlson to Matthew J. Stottle, M.D., whom he saw on April 11, 2018.  Upon examination, Dr. Stottle noted tenderness of the transverse right and left L4, bilateral L4/L5 facet joints, and the SI joint.  Filing No. 8-8, Tr. at 900.  Pain was reproduced with simultaneous extension and lateral rotation as well as with facet loading maneuvers.  Dr. Stottle stated that Carlson's "pain appears to be multifactorial with both nociceptive and neuropathic components."  Id. at 901.  He ultimately recommended that Carlson "undergo a trial of dorsal column stimulation" and suggested Carlson switch to "intrathecal opiates to help with pain control and decrease risk and side effects."  Id.

During the months leading up to Carlson's spinal cord stimulator trial, he saw Dr. Stottle on numerous occasions.  Id. at 884-898.  During this time, Carlson met with a psychiatrist to determine he was a good candidate for the trial, was prescribed other medications with the hopes of eventually replacing Oxycodone, began using Percocet again, and stopped the use of the Fentanyl patches.  The spinal cord stimulator trial was performed on October 11, 2018.  Id. at 881-884.  During a follow-up appointment one week later, Dr. Stottle noted, "Over the past week he has noticed an improvement at times, and at others he did not notice a difference.  He still has one program left that he would like to try prior to pulling the leads . . . .  with increased program and increased level of the SCS he has gotten better relief."  Id. at 880.  On October 22, 2018, Carlson

returned to Dr. Stottle's office and reported a 50% improvement in his back pain. Carlson and Dr. Stottle agreed to move forward with the permanent spinal cord stimulator procedure. *Id.* at 878.

The permanent spinal cord stimulator was placed on December 28, 2018. *Id.* at 867-870. At the one-week follow-up appointment, the stimulator had yet to be programmed and Carlson was in a "tolerable" amount of post-surgical pain. *Id.* His stimulator was programmed, and sutures were removed.

Since 2014, Carlson has seen three psychiatrists. The first, Josh Needelman, Ph.D., spoke with Carlson on November 7, 2016. Dr. Needelman noted that his energy was below average but, "He would likely be able to comply with simple instructions. He can relate well with coworkers and supervisors. Changes in his environment may cause anxiety." Filing No. 8-2, Tr. at 541. Carlson spoke with Jennifer L. Lindner, Ph.D., on July 18, 2017. She noted that he has been more depressed since is injury, and "did appear to be in obvious pain and winced several times . . . . He was shaking visibly during the interview." Filing No. 8-5, Tr. at 712. He appeared irritable and stated that he would go days without eating due to his medications and pain. Dr. Lindner noted, "William does appear to have restriction in daily activity, but it seems to be more physically related than mental health." *Id.* Lastly, Carlson met with Stephanie A. Peterson, Ph.D., on July 31, 2018 in order to qualify for his spinal cord stimulator trial. Filing No. 8-7, Tr. at 817. Dr. Peterson opined, "Mr. Carlson is likely to report greater levels of self-perceived disability, and to catastrophize when experiencing pain. He is also likely to be at increased risk for opioid abuse. Post surgically, he is likely to report greater levels of disability." *Id.* at 818.

20

### D.    ALJ Decision

After examining the evidence, the ALJ determined that Carlson was not disabled. In evaluating Carlson's claim, the ALJ followed the sequential evaluation process.  Filing No. 7-2, Tr. at 11-20.   The ALJ determined that Carlson met the insured status requirements of the Social Security Act through December 31, 2018.  *Id.* at 12.  He also determined that Carlson had not engaged in substantial gainful activity since the alleged onset date of February 6, 2014 through his date last insured.  *Id.*  The ALJ found that Carlson suffered from the severe impairment of lumbar degenerative disc disease.  *Id.* He also found that Carlson suffered from the non-severe impairments of right knee degenerative joint disease and gout.  These impairments were not considered severe as they "did not cause more than a minimal impact on his ability to perform basic work activities for 12 consecutive months."  *Id.* at 12-13.  After considering the four areas of mental functioning as described in the Listing of Impairments, the ALJ determined that Carlson's mental impairments of alcoholism, depression, and anxiety were also non-severe.

The ALJ did not find that Carlson's impairment met or medically equaled the severity of one of the list impairments in 20 C.F.R. Part 404, Subpart P, App. 1.  The ALJ considered listing 1.02, major dysfunction of a joint.  He stated, "The record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of this listing or any other listed impairment."  Filing No. 7-2, Tr. at 14.

The ALJ found that Carlson had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b).  However, Carlson cannot climb ladders,

ropes, or scaffolds. He also cannot crawl, must avoid extreme cold temperatures, vibrations, and other hazards. The ALJ determined that Carlson could occasionally climb ramps and stairs, balance, kneel, stoop, and crouch. Filing No. 7-2, Tr. at 14.

The ALJ did not find Carlson's subjective descriptions of his alleged disabling pain to be credible. He stated that, while Carlson's severe impairment could reasonably be expected to cause his symptoms, "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . ." Id. at 15. While an MRI from July 2014 showed a disc bulge at L5-S1 without any nerve compression, mild to moderate left neural foramen stenosis at L4-5, and moderate to severe bilateral distal stenosis at L4-5, Carlson's orthopedic surgeon, Chris Cornett, M.D., stated that the MRI was "essentially unremarkable" with only "mild stenosis and no nerve compression." Id. The ALJ also pointed to an August 2015 examination where, "Despite his increased pain, on examination the claimant's strength and sensation was normal, he walked independently, and he had no pain with rotation of his hips." Id. While describing Carlson's medical history, the ALJ noted that, during a psychological examination to determine his eligibility for the neurostimulator trial, Dr. Peterson expressed concerned that, "the claimant was likely to report a greater level of self-perceived disability and to catastrophize when experiencing pain, and post-surgically he would likely report a greater level of disability." Id. at 16.

The ALJ gave "great weight" to the medical testimony dated November 7, 2016 of independent psychological examiner, Josh Needelman, Ph.D. Dr. Needelman was afforded great weight because his opinion that Carlson "had adequate concentration,

memory, and his activities of daily living were not impaired by his mental health" was "supported by his own examination findings and [was] consistent with the record" of mostly normal mental health examinations. *Id.* at 16-17.

"Great weight" was afforded by the ALJ to the testimony of independent psychological examiner, Jennifer Linder, Ph.D. She evaluated Carlson on July 18, 2017 and noted that Carlson could carry out instructions, interact with co-workers, and adjust to changes in his routine. She was afforded great weight as it was supported by her own examination and was consistent with the medical record. Specifically, the ALJ noted that "it is consistent with the claimant's lack of any mental health treatment and his mostly normal mental status examinations." *Id.* at 17.

The ALJ afforded "little weight" to Stephanie Peterson, Ph.D.'s medical testimony from her evaluation of Carlson dated July 31, 2018. This is "because she did not provide any mental functional limitations." *Id.* However, the ALJ noted that her observations were consistent with Dr. Needelman and Dr. Linder.

State agency consultant, Rebecca Brayman, Ph.D., was afforded "little weight" by the ALJ because she determined that Carlson had no mental functional limitations, when the record clearly stated that he has been diagnosed with anxiety and was prescribed Clonazepam to treat his symptoms. *Id.* However, the ALJ afforded "great weight" to state psychological consultant, Christopher Milne, Ph.D., who stated that he had no limitation in understanding or applying information. He was afforded great weight by the ALJ on the basis that his statements were consistent with the record and Dr. Needelman and Dr. Linder's opinions. *Id.*

23

Matthew Stottle, M.D., Carlson's treating pain management specialist, was afforded "partial weight" by the ALJ.  The ALJ afforded him "partial weight" because the Dr. Stottle's recommendation that Carlson refrain from bending or twisting were only temporary limitations that would cease once Carlson was healed from the spinal cord stimulator procedure.  *Id.* at 17-18.  However, the ALJ noted that, "by limiting the claimant to occasional stooping, as well as occasional climbing of ramps and stairs, balancing, kneeling, crouching and no climbing of ladders, ropes, or scaffolds or crawling, I have adequately accounted for Dr. Stottle's limitations."  *Id.* at 18.

On February 9, 2019, Dr. LaSure, Carlson's treating physician, completed a questionnaire given to him by Carlson's attorney.  In response to the questions, Dr. LaSure stated that Carlson could not stand for more than two hours in an eight-hour day and could not sit for more than twenty to thirty minutes at a time before needing to change positions.  He also stated that Carlson must lie down during the day and would likely miss two or more days of work per month due to his pain.  *Id.*  Upon reading this questionnaire, the ALJ afforded "little weight" to Dr. LaSure's medical testimony.  The ALJ explained:

> Firstly, it is unclear whether Dr. LaSure provided a medical opinion or if his answers were the claimant'[s] responses to questions about his functioning. For example, to the question whether the claimant would need to walk for three to five minutes after changing position from sitting to standing, Dr. LaSure noted that the claimant said he would not need this accommodation. Secondly, Dr. LaSure's own treatment notes do not indicate that the claimant can only stand for two hours in an eight-hour day or sit for twenty to thirty minutes at a time.  While the claimant clearly experiences back pain, with medications and treatment the claimant reported that his pain is moderately controlled.

*Id.* (citations omitted).

The ALJ afforded "great weight" to state agency medical consultants, Robert Rother, M.D., and Jerry Reed, M.D.  Dr. Roth stated that Carlson could perform light work

24

with limitations such as never crawling and avoiding exposure to extreme cold, vibration, and hazards. Both doctors noted that Carlson could occasionally climb ladders, ropes, scaffolds, ramps, and stairs. The ALJ, however, noted Carlson's continued back pain and newly placed spinal cord stimulator, restricted Carlson to never climbing ladders, ropes, or scaffolds in his RFC determination. *Id.*

The ALJ afforded "little weight" to the opinion of Carlson's niece. The ALJ determined that her testimony was inconsistent with rest of the record. *Id.* at 18-19.

The ALJ then moved on to steps four and five of the sequential analysis. When the vocational expert was asked if Carlson could perform his past relevant work as a retail store manager, the vocation expert testified that while he could perform the work as generally described in the DOT, he could not perform it as actually performed. *Id.* at 19. However, the expert did state that Carlson's transferrable skills allowed him to perform several jobs available in the national economy. The expert noted that Carlson could be employed as an order clerk, customer complaint clerk, or payroll clerk.

## II.   DISCUSSION

### A.   Standard of Review

When reviewing a Social Security Disability benefits decision, the district court does not act as a factfinder or substitute its judgment for the judgment of the ALJ or the Commissioner. *See Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995) (citing *Loving v. Dep't Health & Hum. Serv., Sec.*, 16 F.3d 967, 969 (8th Cir. 1994)). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). Substantial evidence

"is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 19, 229 (1938)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison*, 305 U.S. at 229).

However, this "review is more than a search of the record for evidence supporting the [Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (quoting *Hunt v. Massanari*, 250 F.3d 622, 623 (8th Cir. 2001); *Cooper v. Sullivan*, 919 F.2d 1317, 1320 (8th Cir. 1990)). In determining whether there is substantial evidence to support the Commissioner's decision, this Court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

**B.     Law and Analysis**

**1.     Sequential Analysis**

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's RFC and his or her age, education, and work experience. *Id.* At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998). At step two, the claimant has the burden to prove he or she has a severe medically

determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013).

At step three of the sequential evaluation, "If the claimant suffers from an impairment that is listed in," Appendix 20 C.F.R. Pt. 404, Subpart P ("the listings") "or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience." *Flanery v. Chater*, 112 F.3d 346, 349 (8th Cir. 1997); *see also* 20 C.F.R. § 404.1525. The listings stipulate the criteria for each impairment that is considered presumptively disabling. 20 C.F.R. 404, Subpart P, App. 1. If the claimant does not meet the listing requirements, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545(a). The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical history, opinions of treating physicians and specialty physicians, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015). "'The RFC must (1) give appropriate consideration to all of [the claimant's] impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting.'" *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) (quoting *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still

27

do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform.  *See Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (citing *Reed v. Sullivan*, 988 F.2d 812, 815-16 (8th Cir. 1993)).

### 2.    Treating Physician

"The ALJ must give 'controlling weight' to a treating physician's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'"  *Papesh*, 786 F.3d at 1132 (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007).  Even if not entitled to controlling weight, a treating physician's opinion '"should not ordinarily be disregarded and is entitled to substantial weight."'  *Papesh*, 786 F.3d at 1132 (quoting *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007).  The regulatory framework requires the ALJ to evaluate a testing source's opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source.  *See* 20 C.F.R. 404.1527(c)(2).  "When an ALJ discounts a treating physician's opinion, he should give 'good reasons' for doing so."  *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)).

The Court finds that the ALJ erred in affording only "little weight" to the opinion of Dr. LaSure.  The ALJ only granted Dr. LaSure's opinion "little weight" because his answers to Mr. Cuddigan's five written questions were, according to the ALJ, "not

supported and [in]consistent with the record." Filing No. 7-2, Tr. at 18. However, the ALJ failed to discuss the previous five years of Dr. LaSure's medical testimony. Instead, the ALJ merely focused his entirely analysis on one page of yes or no answers. This does not constitute a "good reason" for discounting five years of Dr. LaSure's medical opinion.

As well as discounting Dr. LaSure's opinion, the ALJ afforded "great weight" to the opinions of the non-examining state agency medical consultants, Dr. Roth and Dr. Reed, because the opinions were consistent with the medical record. "Generally, even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion." Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001). Here, the opinions of the non-examining consultants contradict Dr. LaSure's opinions after several examinations of Carlson. Dr. LaSure consistently noted "pain over distal L spine paraspinous muscles with light touch." Filing No. 7-8, Tr. at 317, 321, 324, 326; Filing No. 8-1, Tr. at 513; Filing No. 8-7, Tr. at 788, 791, 796, 799. Dr. Roth and Dr. Reed's opinions are not consistent with these findings. The ALJ erred in merely granting Dr. LaSure "little weight" while granting "great weight" to the contradictory opinions of the non-examining physicians.

### 3. Credibility

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process: (1) first, the ALJ considers if there is an underlying impairment that could reasonably produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit" the claimant's ability

to work.  Soc. Sec. Rul. 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01 (Mar. 16, 2016).  In the second step of the analysis, in recognition of the fact that "some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence[,]" an ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  81 FR at 14168.

To determine the intensity and persistence of an individual's symptoms, the ALJ evaluates objective medical evidence, but "will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled."  *Id.*  However, the ALJ must "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."  *Id.* at 14169.  If an ALJ cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then he or she must carefully consider other evidence in the record – including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors[1] set forth in [the Social Security] regulations" – in

---

[1] Those factors include:

reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. *Id.*

Social Security Ruling 16-3p also provides:

We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect that ability to perform work-related activities for an adult or the ability to function independently, appropriately, and effectively . . . . Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

*Id.* at 14170. "[The Eighth Circuit Court of Appeals] has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) (citing *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998)). Subjective allegations of disabling pain can be discredited if the claimant has only occasionally followed medical treatment or taken prescribed medications. *Singh*, 222 F.3d at 453; *see Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (stating, "A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole.").

---

"1) Daily activities; 2) The location, duration, frequency, and intensity of pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) Any other factors concerning an individual's function limitations and restrictions due to pain or other symptoms."

81 FR at 14169-70.

The ALJ erred in not finding Carlson's testimony of his disabling pain credible.  The ALJ determined that his testimony was inconsistent with the record and, "[d]espite his increased pain, on examination the claimant's strength and sensation was normal, he walked independently, and he had had no pain with rotation of his hips."  Filing No. 7-2, Tr. at 15.  While that may be true, Carlson also experienced "pain over distal L spine paraspinous muscles" on a frequent basis as well as pain in the "SI area."  Filing No. 7-8, Tr. at 317, 321, 324, 326; Filing No. 8-1, Tr. at 513; Filing No. 8-7, Tr. at 788, 791, 796, 799.  Multiple doctors also found Carlson's pain believable as he was continuously prescribed highly addictive pain medications such as Percocet, Oxycodone, and Fentanyl.  In addition, after Carlson injured his right knee and back in a car accident in November 2011, he eventually stated his knee no longer had pain and his back pain was where it was prior to the car accident.   The record consistently supports Carlson's credibility and should not have been discredited by the ALJ.

### 4.    Vocational Expert's Testimony

In the fourth step of the sequential analysis, the ALJ considers whether a claimant's impairments keep him from doing past relevant work.  20 C.F.R. § 404.1520(e). A claimant's RFC is the most that one can do despite his or her limitations.  20 C.F.R. § 404.1545(a)(1).  The claimant is not disabled if the claimant retains the RFC to perform: "1) the actual functional demands and job duties of a particular past relevant job; or 2) the functional demands and job duties of the occupation as generally required by employers throughout the national economy."  Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996) (quoting Soc. Sec. Ruling 82-61).  During this step, an ALJ may consider the vocational expert's testimony when determining the claimant's RFC.  Wagner v. Astrue, 499 F.3d

842, 853-54 (8th Cir. 2007).   The ALJ often asks the vocational expert a hypothetical question to help determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant.  *Guillams,* 393 F.3d 798, 804 (8th Cir. 2005).  "If the claimant is age 55-59 or age 60 and older, [the vocational expert] must also be prepared to testify about whether there is transferability under the rules for claimants of those ages."   Soc. Sec. Admin., Vocational Expert Handbook 35 (June 2020).

The vocational expert was not qualified to testify at the hearing.  He admitted that he was not familiar with the Social Security's Rules and Regulations that describe the procedure for determining transferable skills.  Filing No. 7-2, Tr. at 59.  Considering the age of Carlson, determining whether he possesses transferable skills is a major component of the disability determination at step five.  The ALJ erred in allowing the vocational expert to continue his testimony and he erred in relying on said testimony in his decision.  For these reasons, the entirety of the vocational expert's testimony is discredited.

## III.   CONCLUSION

The clear weight of the evidence points to a conclusion that Carlson has been disabled since February 6, 2014.  "Where further hearings would merely delay a receipt of benefits, an order granting benefits is appropriate."   *Hutsell v. Massanari,* 259 F.3d 707, 714 (8th Cir. 2001) (quoting *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir. 1984). Accordingly,

IT IS ORDERED:

1.  Plaintiff's motion to reverse (Filing No. 12) is granted;

2.  Defendant's motion to affirm (Filing No. 14) is denied;

3.  The decision of the Commissioner is reversed; and

4.   This action is remanded to the Social Security Administration for an award of

benefits.

5.  A judgment will be entered in accordance with this memorandum and order.


Dated this 21st day of July, 2020.

                                        BY THE COURT:

                                        s/ Joseph F. Bataillon
                                        Senior United States District Judge